Todd A. Boock (SBN 181933)
 *todd@bnsklaw.com*
Jill Ray Glennon (SBN 204506)
 *jill@bnsklaw.com*
**BROWN NERI SMITH & KHAN LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California  90025
Telephone:   (310) 593-9890
Facsimile:    (310) 593-9980

James A. Lassart (SBN 040913)
 *JLassart@mpbf.com*
Adrian G. Driscoll (SBN 095468)
 *ADriscoll@mbpf.com*
**MURPHY, PEARSON, BRADLEY & FEENEY**
580 California Street, Suite 1100
San Francisco, California  94104-1001
Telephone:   (415) 788-1900
Facsimile:    (415) 393-8087

*Attorneys for Plaintiff/Counter-Defendant*
EPICENTRX, INC.

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| EPICENTRX, INC., a Delaware corporation, | Case No. 3:20-cv-01058-JO-DDL<br>Hon. Jinsook Ohta<br>Magistrate:  Hon. David D. Leshner |
|---|---|
| Plaintiff/Counter-Defendant, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF/COUNTER-DEFENDANT EPICENTRX, INC.'S MOTION FOR TERMINATING SANCTIONS, OR ALTERNATIVELY, MONETARY SANCTIONS IN THE AMOUNT OF $262,288.84, AGAINST DEFENDANT/ COUNTERCLAIMANT COREY A.** |
| COREY A. CARTER, M.D., | |
| Defendant/Counter-Claimant. | |

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CARTER AND HIS ATTORNEYS, PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 11(c)(2)**

Date:    April 11, 2023
Time:    9:00 a.m.
Ctrm.:  4C

NO ORAL ARGUMENT UNLESS ORDERED BY THE COURT

[Filed concurrently:  Notice of Motion and Motion; Request for Judicial Notice; Declarations of Todd A. Boock, Lohman & Associates, Inc., fka Lohman & Dehner, Inc., Regan Lohman, Daniel Dehner and Shannon Wittman; and [Proposed] Order]

Complaint Filed:    June 9, 2020
CC Filed:        July 15, 2020
1st Am. CC Filed:  August 26, 2020
2nd Am. CC Filed: February 2, 2022

# **TABLE OF CONTENTS**

I.   INTRODUCTION                                                                 2

II.  STATEMENT OF FACTS                                                           5

     A. EpicentRx Gave Defendant and Counsel Notice
        Per Rule 11(c)(2)                                                         5
     B. The Case and the Parties                                                  6
     C. EpicentRx's Complaint                                                     8
     D. Defendant's Counterclaim                                                  8
     E. Defendant's Amended Counterclaim                                          9
     F. Defendant Falsely Relies On A "Promissory Note"
        and "Guarantee" That He Knows To Be Fraudulent                           11
     G. This Court Grants EpicentRx's Motion to Dismiss
        the First Amended Counterclaim                                           13
     H. Defendant and Counsel File Their Second Amended
        Complaint, Premised On The Same False Claims Plus
        New Tales Created To Avoid Dismissal                                      13
     I. The Allegations Upon Which Defendant Bases His
        Counterclaims Are A Farce                                                19
     J. Reality and the Evidence Clearly Show that Defendant
        and His Attorney Know the Counterclaims Are
        Premised on Lies                                                          23
     K. Defendant Planned to Harm EpicentRx Before he was Fired                  27
     L. Defendant and His Counsel Deceive EpicentRx and
        the Court as to the Illegal Surveillance Cameras                         28
     M. Defendant and His Attorneys Refuse to Return
        Company Property                                                         32
     N. Defendant And His Attorneys Engage In Egregious
        Litigation Conduct To Deflect From Their Violations
        of Rule 11                                                               33

III. ARGUMENT                                                                    35

     A. Rule 11 Calls for Terminating and/or Monetary Sanctions                  35
     B. Defendant and His Counsel Premise Their Entire Case
        on Allegations That They Know to be False And Were
        Disingenuous About the Surveillance System.                             37

IV.  CONCLUSION                                                                  39

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

For more than two years, Defendant and Counterclaimant Corey A. Carter, M.D. ("Defendant") and his counsel, Guy A. Ricciardulli, Attorney At Law, have perpetrated a fraud on this Court and Plaintiff and Counter-Defendant EpicentRx, Inc. ("EpicentRx" or "Plaintiff").  From the outset, Defendant's farcical claims against EpicentRx have been premised on a document that is fraudulent on its face – a "Personal Guarantee" and "Promissory Note" that Defendant knew was invalid and had nothing to do with EpicentRx – and the absurd fiction that he was terminated because he reported his "subjectively and objectively reasonable belief" that EpicentRx was engaged in wrongdoing.  ECF No. 174 (Defendant's Second Amended Counterclaim ("SACC")), ¶ 40.  This Court initially did not believe Defendant's stories (as made clear by Hon. Larry Alan Burns' December 20, 2021 Order [ECF 157], granting EpicentRx's Motion to Dismiss the First Amended Counterclaim [ECF 44])[1]; EpicentRx did not believe them; and neither Defendant nor his attorneys believe them, either.

There has not been a single witness or scintilla of evidence in this case that supports Defendant's claims.  In fact, the reverse is true – every witness with supposed knowledge of Defendant's claims and every related item of discovery indisputably shows that Defendant did not and could not have believed that EpicentRx was involved in the supposed fraudulent investment scheme; that any

---

[1] Defendant was able to barely escape dismissal of his Second Amended Counterclaim, with only two of his three remaining causes of action surviving EpicentRx's Motion to Dismiss.  This Court held that Defendant was able to sufficiently plead those claims – further perpetrating his fraud on the Court – by adding more fabricated allegations to his counterclaims.  Although EpicentRx was not permitted to raise evidence outside of the pleadings in support of its Motion to Dismiss, Defendant and his attorney were well aware of the evidence and that their allegations were untrue.

rational person with even a fraction of Defendant's knowledge could not have believe that EpicentRx was involved in any such scheme; that Defendant *knew* that EpicentRx was not involved in any scheme; that Defendant never disclosed to EpicentRx that he believed it was involved any scheme; that Defendant was well aware that EpicentRx management had grave concerns about his conduct and competence and was likely going to fire him; and that Defendant concocted his fairy tale that forms the basis of his Counterclaims to avoid termination, create chaos and "take down" the Company, as he admitted to former General Counsel Sarah Hibbard weeks before his termination.  ECF 240-6 (Declaration of Todd A. Boock, filed in Support of EpicentRx's Motion for Summary Judgment as to Defendant's Second Amended Counterclaim ("Boock MSJ Decl.")), Ex. 12, Bates No. HIBB000573. Despite this knowledge, Defendant and his counsel filed their Counterclaim as a "shakedown," with the hope of a quick payout, but now enough is enough.

Even if Defendant and his counsel could have buried their heads in the sand and claimed ignorance of the facts at the outset (which they could not, nor could any reasonable person), discovery has made very clear that their case is founded on falsehoods.  After more than two years of litigating this nonsense and spending countless hours and hundreds of thousands of dollars, ***enough is enough***.  Since Defendant and his counsel refuse to put an end to this flagrant abuse of the Court system, EpicentRx is forced to ask the Court to do so; or alternatively, issue a significant monetary sanction to prevent further abuse, as called for by Federal Rules of Civil Procedure, Rule 11.

Pursuant to Federal Rules of Civil Procedure, Rule 11(b), by "signing, filing, submitting, or later advocating" a pleading, an attorney or party "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the pleading, among other things:

- "is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation";

---

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

3

- "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law";
- "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"; and
- "the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

Here, Defendant and his counsel have violated their continuing duties under Rule 11 for *more than two years*, since they first filed their Counterclaim on July 15, 2020 [ECF 8]. Defendant and his attorneys have premised their entire fictional "case" against EpicentRx, as stated in the Counterclaim and other pleadings, on a forged and fraudulent document that ***they know for a fact is forged and fraudulent***, and on facts that ***they know not to be true***. Rule 11 should have prevented them from filing the Counterclaim in the first place, and it further required them to immediately dismiss their Counterclaim as the evidence clearly showed that it had no legal or factual basis, but they refused and continue to refuse to do so. Again, ***enough is enough***.

Defendant and his attorneys have clearly maintained their case against EpicentRx "for an improper purpose," "to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Defendant and his attorneys know that their, "claims, defenses, and other legal contentions," are <u>not</u> "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Defendant and his attorneys are also aware that their factual contentions have zero "evidentiary support," nor with they ever "likely have evidentiary support after a reasonable opportunity for further investigation or discovery." And after more than two years of litigation, it is crystal clear to Defendant and his counsel that their "denials of factual contentions," are <u>not</u>

"warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

The bottom line is that Defendant and his counsel filled their Counterclaim, its two amended versions, and subsequent pleadings with facts that they knew to be untrue and legal contentions that they knew lacked merit and were not supported by the facts.  There can be no better basis for this Court to issue terminating sanctions and/or a significant monetary sanction in the amount of $262,288.84[2] against Defendant and his attorneys for their brazen violations of Rule 11, waste of this Court's time, and vicious attempt to diminish EpicentRx's resources fighting a frivolous lawsuit.  The Court needs to put a stop to his folly – ***enough is enough***.

## II.   **STATEMENT OF FACTS**

### A.   **EpicentRx Gave Defendant and Counsel Notice Per Rule 11(c)(2)**

On August 3, 2022, EpicentRx's attorney sent Defendant's attorney a letter, attaching the draft Motion for Sanctions.  Boock Decl., ¶ 3, Ex. A.  As of this writing, defense counsel has not responded, and it has been more than four months, well after the 21-day "safe harbor" period required by Rule 11.  *Id*.  EpicentRx has updated the Motion, due to further developments in the case, some of which have exacerbated the egregiousness of Defendant's and his attorney's conduct; and some of which became moot.  However, the arguments and primary issues are identical to the original draft sent to counsel.  *Id.*, ¶¶ 4, 35.

Although there are few cases on point, the Ninth Circuit does not explicitly require a party to re-start the "safe harbor" period in such situations. *See, e.g., Shared Medical Resources, LLC v. Histologics, LLC*, 2013 WL 12138901, at *2 (C.D. Cal. May 23, 2013) ("The Court does not find applicable to this case the authorities that Plaintiff cites for the proposition that counsel must be served with a

---

[2] This is the amount of fees and costs billed to EpicentRx solely to the Counterclaim.  Declaration of Todd A. Boock ("Boock Decl"), filed concurrently herewith, ¶ 2.

'filing-ready motion' as notice that an opposing party seeks sanctions"); *Rygg v. Hulbert*, No. C11-1827JLR, 2012 WL 12847008, at *3 (W.D. Wa. Sept. 21, 2012) (procedural requirements of Rule 11 are satisfied even where "the motion served to satisfy the safe harbor requirements is different from the motion filed with the court, so long as the filed motion does not raise any new arguments."). Here, it would be manifestly unjust and not in the spirit of Rule 11 for Defendant and his counsel to profit from their continuing misconduct and proffer of claims and "facts" that they know to be untrue; and for EpicentRx to be forced to re-start the clock on filing this Motion.

EpicentRx met and conferred with Defendant, via counsel for the parties, on February 1, 2023, less than 30 days before filing this Motion. EpicentRx's counsel discussed in detail the issues raised by this Motion and also discussed the prior version of the Motion served on August 5, 2022. Declaration of Todd A. Boock re Meet and Confer, ¶ 2; Boock Decl., ¶ 34. Even though the parties met and conferred on all of the issues, Defendants and his counsel refused to withdraw the Second Amended Counterclaim. Consequently, provided Defendant and counsel with an additional safe harbor period would be futile.

### B.  The Case and the Parties

This is a case about a former at-will employee of a small biotech company, who was terminated for cause, due to his duplicity and failure to follow basic human resources policies pertaining to his treatment of subordinates and colleagues, particularly women, on whom he inflicted extreme emotional distress and harm due to relentless and widespread harassment and intimidation.

EpicentRx is a patient-driven clinical cancer immune-oncology company with minimally toxic therapies that work across diverse patient populations and tumor types for the best possible quality of life during treatment. *See, e.g.*, ECF 1 (Complaint), ¶ 11. EpicentRx's entire mission has been to develop treatments for cancer, and Defendant's and his counsel's Counterclaim and conduct in this case (as

well as Defendant's improper conduct while employed) have resulted in a significant diversion of attention and resources from that mission due to this litigation.

Defendant is EpicentRx's former Chief Executive Officer.  EpicentRx regretfully hired Defendant based on deception and the lies he told to excuse his history of bad behavior.  *See* ECF 1 (Complaint), ¶ 30, Exhibit A.  Unfortunately, Defendant's pattern of behavior continued and got worse while at EpicentRx. Defendant has benignly presented himself as a former military doctor in good standing whose "well-known and well-respected" reputation preceded his employment at EpicentRx.  *See, e.g.,* ECF 174 (SACC), ¶ 4; ECF 185 (Defendant's Opposition to Motion to Dismiss SACC), 1:24-25.  In fact, unbeknownst to EpicentRx at the time he was hired, on information and belief, Defendant's clinical privileges at Walter Reed National Military Medical Center and his medical license were suspended.  Boock Decl., ¶ 5; Exhibit B.  That information only came to light at the end of Defendant's dysfunctional tenure with the Company.

In addition, Defendant had been charged by the U.S. Navy for a variety of serious violations, including failure to obey a lawful order, conflicts of interest with his position in the Navy and violation of professional ethics, all of which he explained away as coming from his spurned wife, with whom he was in the middle of an acrimonious divorce.  ECF 1 (Complaint), Ex. A; Boock Decl., ¶ 6, Ex. C. According to records produced in discovery, it was this same ex-wife who gave a

███████████████████████████████████████████████

████████████████████  Boock Decl.,  ¶ 7, Ex. D.  Although Defendant and his counsel frequently claim that Defendant was completely exonerated on all charges, the reality is that ███████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████  *Id*., ¶ 8, Ex. E.

### C.   EpicentRx's Complaint

- EpicentRx terminated Defendant for cause on Friday, May 8, 2020, at the recommendation of the Company's human resources lead, due to his continuing pattern of improper conduct, as described in the Complaint.  ECF 1 (Complaint), ¶¶ 48-74.  On Monday, May 11, 2020, while cleaning out Defendant's office, EpicentRx discovered to its shock and dismay that Defendant had installed three audio-visual surveillance devices inside the Company's facilities.  In addition, EpicentRx learned that these devices retained recordings in one or more cloud accounts connected to Defendant's *personal* email address.  *Id.*, ¶¶ 77-85.  Given the type of proprietary scientific work in which EpicentRx was involved, Defendant's surreptitious surveillance was extremely troubling.  In addition, it was obvious from the surveillance that Defendant was well aware that his job was on the line and EpicentRx was not happy with him.  *Id.*, ¶¶ 70-85; ECF 271-4 (Oronsky MSJ Declaration), ¶¶ 30-34; ECF 271-3 (Caroen MSJ Declaration), ¶¶ 27-32; ECF 271-5 (Reid MSJ Declaration), ¶¶ 21-33; Boock MSJ Decl., ¶¶ 5, 14, Exs. 4 (Hibbard Deposition), 12 (text messages – *see, e.g.*, pages HIBBARD000545-45; 000550; 000557; 573).

- He thus made up the malfeasance accusations that form the basis of his Counterclaim to deflect from his own poor conduct, protect himself from termination and a lawsuit, and leverage a significant payout.  After further investigation into Defendant's behavior, both before and after his termination, EpicentRx filed its lawsuit on June 9, 2020.  ECF 1 (Complaint).

### D.   Defendant's Counterclaim

On July 15, 2020, Defendant filed a Counterclaim against EpicentRx, implausibly claiming that EpicentRx had terminated his employment in breach of his at-will employment contract; and that he was illegally terminated in retaliation for his "whistleblower" claims.  ECF 8 (Defendant's original Counterclaim

("OCC").

The premise of the OCC was absurd.  In sum, Defendant claimed that he received information from third parties stating that:

> moneys obtained from putative investors was illicitly placed in several bank accounts unrelated to the activities of EPICENTRX, and unknown to CARTER.  The funds in question were solicited from prospective investors allegedly on behalf of EPICENTRX. The extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and needed to be investigated.

*Id.*, ¶ 21.

In other words, Defendant spun a tale in which third parties claimed that they were induced to invest money in what they thought was EpicentRx, but in fact was not.  Defendant had no information whatsoever that anyone at EpicentRx was involved, as this was "unknown" and "needed to be investigated."  *Id.*  This is *not* an objectively and subjectively reasonable belief that EpicentRx was involved in any wrongdoing, nor was it a protected disclosure as a matter of law (as EpicentRx argued in its Motions to Dismiss the OCC [ECF 24] and Defendant's subsequent Amended Counterclaim ("ACC") [ECF 44]; and with which the Court agreed, when it granted the latter Motion [ECF 157 (December 20, 2021 Order)]).

Defendant further alleged that, at a Board Meeting on May 8, 2020, "CARTER presented a PowerPoint presentation that clearly outlined his concerns for EPICENTRX including the various individuals who paid money to invest in EPICENTRX."  ECF 8 (OCC), ¶ 28.  He did not attach this PowerPoint to the Complaint.

### E.    **Defendant's Amended Counterclaim**

Due to the many deficiencies in Defendant's OCC, EpicentRx filed a Motion to Dismiss on August 5, 2020 [ECF 24].  Rather than oppose the Motion, Defendant and his counsel opted to instead double-down on their knowingly baseless allegations and file their Amended Counterclaim on August 26, 2020 [ECF 39].  Defendant, who has never been held back by the constraints of honesty in his

dealings with EpicentRx or this Court, amended his Counterclaim by changing his tune about what he knew and what he reported to the Board.  In a naked attempt to change prior facts to cure his claims, Defendant suddenly professed knowledge where he *admitted* he had none before.  *See, e.g.,* ECF 8 (OCC), ¶ 21; and ECF 39 (ACC), ¶ 36.  Still, he continued to concede, "The full extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and needed to be investigated." ECF 39 (ACC), ¶ 22.  Yet, in his ACC, Defendant contradicted his earlier pleading and repeatedly claimed that he "had a subjectively and objectively reasonable belief that agents of EpicentRx and/or third parties associated with EpicentRx were violating state and federal laws and reported those violations to EpicentRx's management." *Id*., ¶ 36.  In addition, Defendant attached the PowerPoint that he allegedly presented to the Board as an Exhibit to the ACC.  ECF 39-2 (Exhibit 2 to ACC).

The PowerPoint is exceptionally problematic for Defendant.  First, among other things, Defendant wrote:

- "We need to take steps to ensure the company is safe." *Id*., Ex. 2, p. 7.
- "It is critical that we don't accuse any one person and we obtain independence in this investigation." *Id*.
- "We need to understand the potential risk and liability."

As the Court later found, statements like these wholly contradict that notion that Defendant had an objectively and subjectively reasonable belief that the Company had engaged in wrongdoing.  *See* ECF 157 (December 20, 2021 Order).

In addition, Defendant wrote in the PowerPoint that there was a "Personal Guarantee signed by Neil Oronsky who misrepresented that he was the Company's CEO."  ECF 39-2 (Ex. 2 to ACC), p. 4.  Defendant and his attorneys were well aware that this "Personal Guarantee" was fraudulent and never signed by Neil Oronsky, based on Defendant's own later testimony and pure common sense.  As discussed below, this did not stop Defendant from falsely declaring under penalty of

perjury that the fraudulent document supported and, at least in part, formed the basis of his purported belief (*see* ECF 23-2 (Declaration of Corey A. Carter, dated August 3, 2020, filed in support Opposition to Preliminary Injunction ("August 3, 2020 Carter Decl.")), ¶ 14).

## F. **Defendant Falsely Relies On A "Promissory Note" and "Guarantee" That He Knows To Be Fraudulent**

Defendant and his counsel pushed their false reliance on the fraudulent note further in a sworn declaration filed in support of their Opposition to EpicentRx's Application for a Temporary Restraining Order:

> I was provided with information and documents regarding Neil Oronsky ("N. ORONSKY") participating in some of the fraudulent schemes that were being investigated. N. ORONSKY is the son of A. ORONSKY, the EPICENTRX Chairman of the Board. The documents discovered involved N. ORONSKY blatantly misrepresenting himself by executing corporate debt instruments purporting to be the Chief Executive Officer ("CEO") of EPICENTRX. Notably, N. ORONSKY had no office, executive position or authority with EPICENTRX. Attached hereto as Exhibit 1 is a true and correct copy of one such corporate debt instrument signed and notarized by N. ORONSKY. I am informed and believe that this is one of the documents used to defraud putative investors.

ECF 23-2 (August 3, 2020 Carter Decl.), ¶ 14.

In fact, as Defendant and his counsel are well aware, the supposed "corporate debt instrument" was nothing of the kind. First, Defendant admitted in his Declaration that Neil Oronsky was not the CEO of EpicentRx (which was obvious, since Defendant himself was the CEO), and Mr. Oronsky "had no office, executive position or authority" with EpicentRx. *Id.* Moreover, Defendant admitted during his deposition that "Neil Oronsky's name was misspelled." Boock Decl., ¶ 10, Ex. L (Transcript of Deposition of Corey A. Carter ("Carter Tr."), 218:4-7). Indeed, even a cursory review of the document shows that Neil Oronsky's name was misspelled not once, but *twice*, as "*Neal* Oronsky" in the signature block, and as

"Neil Oronsky *Chrales*" in the notary attestation.[3]  ECF 23-2 (August 3, 2020 Carter Decl.), Exhibit 1.

Moreover, the attached, "Straight Promissory Note With Personal Guarantees" is signed by "Dan Davis, an individual, with shareholder rights in EpicentRx."  *Id.*  As CEO, Defendant (and thus, his counsel) certainly knew that Mr. Davis was not a shareholder in EpicentRx.  This is particularly so, due to his authority and access as CEO, and his familiarity with the capitalization table, which he alleged in the OCC was "complete":  "The CAP Table that the independent accounting firm was charged by EPICENTRX to create took the independent accounting firm over 6 weeks to complete[.]"  ECF 8 (OCC), 24:1-2.

Finally, the document on its face makes no sense.  According to its terms, a third party investor, Jerald Schutte, was going to wire $135,000 to EpicentRx by August 24, 2015, and then third-party Dan Davis would pay that back *plus* $65,000 in interest (at a rate of 48%), for a total of $195,000, no later than *four days later*.  ECF 23-2 (August 3, 2020 Carter Decl.), Ex. 1.  It goes without saying that such an arrangement is entirely inconsistent with the fictional tale Defendant claims to have spun to the Board, that "These people have each alleged that they have made significant investment in our company in return for promised equity or stock."  ECF 39-2 (Ex. 2 to ACC), p. 3.  According to the fraudulent document, Mr. Schutte was not making an investment – he was providing EpicentRx with a loan at a *usurious* interest rate.  In addition, the fact that Defendant *knew* that neither of the individuals on the document were affiliated with EpicentRx, coupled with the glaring errors and absurd financial terms stated therein, makes clear that neither he nor his counsel *ever* believed that the document was valid or had anything to do with EpicentRx.  Nonetheless, Defendant and his counsel have persisted in this farce for *more than*

---

[3] Indeed, on information and belief, even the notary whose acknowledgment is on the supposed "Guarantee," has questioned the validity of these documents.

1    *two years.*

2    **G.**   **This Court Grants EpicentRx's Motion to Dismiss the First**

3            **Amended Counterclaim**

4        On September 9, 2020, EpicentRx filed its Motion to Dismiss the ACC [ECF

5    44], and the Motion was fully briefed by both parties.  On December 20, 2021, this

6    Court ***granted*** the Motion, dismissing Defendant's three contractual claims *with*

7    prejudice and his "whistleblower" retaliation and UCL claim without prejudice.

8    ECF 157 (December 20, 2021 Order).  The Court's Order made clear that

9    Defendant's allegations were not credible, as they were contradicted by the very

10   documents he presented to support them.

11       Judge Burns found that Defendant's PowerPoint presentation contradicted the

12   allegations and "'was not motivated by [Defendant's] belief that a law had been

13   broken'… and that [Defendant] was instead merely 'report[ing] information relevant

14   to his employer's interest…. " *Id.*, 9:19-22 (internal citations omitted).  "Where, as

15   here, the allegations directly contradict the presentation attached as an exhibit to the

16   ACC, the Court can't accept those allegations as true. [Citation]." *Id.*, 9:22-24.  In

17   other words, no matter how Defendant and his counsel try to minimize them, the

18   slides in that presentation contradict Defendant's allegations in the ACC that he

19   actually believed that EpicentRx employees and agents violated the law.  *Id.*, 9:24-

20   26.

21       Even though the Court made clear that it could not accept his "allegations as

22   true," Defendant and his counsel ignored this clear message and continued to proffer

23   false allegations and legal claims unsupported by the facts or law.

24   **H.**   **Defendant and Counsel File Their Second Amended Complaint,**

25          **Premised On The Same False Claims Plus New Tales Created To**

26          **Avoid Dismissal**

27       On February 2, 2022, Defendant and his counsel filed their Second Amended

28   Complaint, continuing to rely on the fraudulent document, but changing their story

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

yet again, in a desperate attempt to avoid dismissal.  ECF 174 (SACC).  The factual assertions Defendant and his counsel made in the SACC are notably inconsistent with those he made in his August 3, 2020 Declaration and the OCC and ACC.  For example, Defendant swore under penalty of perjury in his Declaration that, "The extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to me at that time and needed to be investigated." ECF 23-2 (August 3, 2020 Carter Decl.), 4:24-26.  He and his counsel made virtually the same allegation in the OCC and ACC.  ECF 8 (OCC), ¶ 21; ECF 39 (ACC), ¶ 22. Despite the fact that his claims relied on the same fraudulent document, Defendant changed this in the SACC to, "Initially, the full extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and CARTER believed it needed to be investigated."  ECF 174 (SACC), 4:11-13.

In addition, despite previously *admitting in his sworn declaration and **all of the prior versions of his Complaint*** that, "The extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to me at that time and needed to be investigated," Defendant and his counsel made up facts and suddenly attempted to identify by name certain EpicentRx employees, directors and other persons that Defendant purportedly "believed" were involved in the fictional scheme when he gave his report to the Board (without ever providing those names or any suggestion that EpicentRx was involved at all).  In support of that fictional "belief," Defendant relied on the same facts previously deemed insufficient by Judge Burns.  Defendant also admits that he never disclosed any specific details of the alleged scheme or anyone involved to EpicentRx.

The ACC alleged:

- In September, 2019 an independent accounting firm identified several improper and potentially illegal actions by corporate employees and consultants and third persons.  ECF 39 (ACC) ¶¶ 13 and 14;

- Key employees refused to cooperate with the accounting firm despite Defendant's urging that they do so. *Id.*, ¶¶ 15;
- The CAP table took over 6 weeks to complete as a result of that non-cooperation. *Id.*, ¶ 17;
- The accounting firm discovered unknown and undisclosed bank accounts. *Id.*, ¶ 18;
- The accounting firm was terminated before it could complete its work. *Id.*;
- EpicentRx's general counsel was terminated when she followed up on the irregularities discovered by the accounting firm. *Id.*, ¶ 19;
- In the summer of 2019, third party putative investors contacted Defendant and told him they had been induced by EpicentRx agents to purchase shares of EpicentRx, which they never received. *Id.*, ¶ 20;
- The value of the individual investments was up to $450,000 or more. *Id.*, ¶ 21;
- Their money was placed into accounts unrelated to EpicentRx. *Id.*, ¶ 22;
- Defendant told Arnold Oronsky about the third party claims, and Dr. Oronsky denied the allegations and told Defendant to ignore them. *Id.*, ¶ 23;
- Defendant continued to receive communications from third parties who told similar stories that they were defrauded by EpicentRx. *Id.*, ¶¶ 21 and 24, and Ex. 2; and
- Defendant then began a formal investigation into the third party allegations, which ultimately uncovered that the misconduct associated with the fraudulent schemes exceeded several million dollars, and confirmed Defendant's belief that EpicentRx's agents and employees were engaged in illegal and fraudulent misconduct. *Id.*, ¶ 24.

The SACC added the following "new" information:

- The formal investigation that Defendant commissioned was performed by a licensed private investigation firm. ECF 174 (SACC), ¶ 17;
- The investigators interviewed over 25 people, obtained documents and provided Defendant with reports. *Id.*; and
- Defendant believed the individuals affiliated with EpicentRx who were involved in the fraudulent scheme were Scott Caroen (employee and member of senior management[4]); Dan Davis (a "retained EpicentRx consultant"), A. Oronsky (Chairman of the Board), Stephen Davis (a

---

[4] Contradicting Defendant's prior description that Mr. Caroen was a "low level office manager." ECF 23-2 (August 3, 2020 Carter Declaration), 16:24-25.

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

15

corporate officer) and Neil Oronsky (son of A. Oronsky "who repeatedly represented himself as an EpicentRx officer"). *Id*.

Defendant and his counsel now suddenly claimed that Defendant reasonably believed that the named individuals were involved in the fraudulent scheme based on the third party claims and the investigation reports. *Id*., ¶ 18.  However, this is entirely inconsistent with Defendant's prior allegations and sworn statement that ***"the full extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and CARTER believed it needed to be investigated"*** and his admission that he never disclosed the "details as to the result of the investigation" or the names of the individuals involved to EpicentRx.  ECF 174 (SACC), 4:11-13, 9:7-10.  By proffering these amended allegations, Defendant and his attorneys were asking this Court to believe that Defendant was able to go back in time and somehow extract helpful new facts from knowledge that *existed in his own mind at the time of his termination*, which he not only failed to previously allege, but which *contradict his multiple prior claims of lacking any knowledge*.  The timing of this revisionist history should not go unnoticed, either – Defendant and his counsel only made these claims *after* the Court ruled, "Where, as here, the allegations directly contradict the presentation attached as an exhibit to the ACC, the Court can't accept those allegations as true. [Citation]" and that Defendant's report to the Board "was not motivated by [Defendant's] belief that a law had been broken'… and that [Defendant] was instead merely 'report[ing] information relevant to his employer's interest…. "  ECF 157 (December 20, 2021 Court Order), 9:19-24 (internal citations omitted).  The inescapable conclusion is that Defendant and his attorneys manufactured these facts out of whole cloth to avoid dismissal, and this violates Rule 11.

In addition, the SACC does not allege (1) whether any of the named individuals were identified by the third party investors; (2) whether any of the named individuals were referenced in the documents collected as part of the

investigation; (3) whether the named individuals were referenced in any of the reports provided by the investigator.  There are no allegations anywhere in the SACC describing the role[s] that each named individual purportedly played in the fraudulent scheme.

Defendant and counsel still attached the PowerPoint as Exhibit 2 to the Complaint, again pretending to rely on the fraudulent document, claiming *again* "that there was a "Personal Guarantee signed by Neil Oronsky who misrepresented that he was the Company's CEO."  ECF 174-2 (Exhibit 2 to SACC), p. 4. Nonetheless, Defendant and his counsel know that this is a false statement, much like Defendant knew it at the time he allegedly presented it to the Board.

In an attempt to avoid the Court's previous finding that the PowerPoint presentation is inconsistent with the allegation that Defendant believed EpicentRx agents were violating the law [ECF 157 (December 20, 2021 Order), 9:24-26], Defendant and his attorneys amazingly crafted additional tall tales.  To wit, the SACC now alleged that the PowerPoint was only ever intended to be an "outline" of Defendant's concerns of wrongful conduct, and that Defendant was prevented from providing further details regarding the investigation at the Board meeting.  ECF 174 (SACC), ¶ 32.  The SACC further alleged, "It was reasonable for CARTER not to detail the allegations of misconduct and the evidence of misconduct in a PowerPoint presentation prior to the meeting as the PowerPoint was intended to be an outline." *Id*.

Those allegations stand in stark contrast to the ACC, which alleged that "[p]rior to and at the full Board meeting, CARTER presented a PowerPoint presentation that *clearly* outlined his concerns for EPICENTRX, including the various individuals who paid money to invest in EPICENTRX."  ECF 39 (ACC), ¶ 29 [emphasis added].  The SACC does not allege that Defendant *tried* to disclose misconduct on the part of EpicentRx employees, but was prevented from doing so. The ACC asserts that Defendant *did* disclose his subjective belief that material

misconduct affecting EpicentRx was taking place and cites the PowerPoint presentation as evidence.  *Id*., ¶¶ 29, 34-35.  In fact, Defendant admitted in his deposition that the only documentation he provided to the Board before his termination was the PowerPoint and fraudulent note.  Boock Decl., ¶ 10, Ex. H (Carter Tr.), 216:17-20; 216:24-217:15; 274:25-275:5.  Given that the ACC and SACC cannot both be true – that the PowerPoint "clearly outlined his concerns for EPICENTRX, including the various individuals who paid money to invest in EPICENTRX," and "It was reasonable for CARTER not to detail the allegations of misconduct and the evidence of misconduct in a PowerPoint presentation prior to the meeting as the PowerPoint was intended to be an outline" – either Defendant specified all of his concerns or he did not – it is obvious that the version in the SACC is false and crafted to avoid a motion to dismiss.  Defendant and his attorneys knew so when the SACC was signed and filed.

The bottom line is that Defendant and his attorneys know that:  (1) the document upon which they premise their Counterclaim is fraudulent and invalid on its face; (2) Defendant never had any knowledge of improper conduct by EpicentRx officers, employees or agents in the supposed investment scheme, nor does he now, *because it never happened*; (3) Defendant never believed that EpicentRx had anything to do with a scheme; (4) Defendant disclosed his fairy tale about a third-party scheme but *never* reported to the Board that EpicentRx or any of its employees were involved; (5) Defendant admitted multiple times, "the extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and needed to be investigated"; (6) Defendant only started telling the investment story when he knew his job was in trouble, in a misguided and fraudulent effort to protect himself from his inevitable termination; and (7) Defendant used the possibility that third parties were taking money in EpicentRx's name to falsely claim that he was wrongfully terminated and extort a payout from his former employer.  Despite their clear knowledge that they did not have sufficient

facts to support their claims, that their Counterclaim had no legal merit, and that the true facts would not overcome this Court's December 20, 2021 Order granting EpicentRx's Motion to Dismiss, Defendant and his attorneys have continued to pursue their baseless claims.

I.      **The Allegations Upon Which Defendant Bases His Counterclaims Are A Farce**

The allegations upon which Defendant Bases His Counterclaim include the following, in relevant part:

- "From the inception of his work at EPICENTRX, CARTER performed his obligations admirably. At no time was CARTER ever disciplined or reprimanded for any work performance issue. His personnel file is devoid of any derogatory entries."  SACC, ¶ 10.

- "Beginning in or about the summer of 2019 and continuing thereafter, CARTER, in his capacity as President and CEO, was directly contacted by no fewer than twelve third party putative investors who alleged they had been induced by EPICENTRX'S agents to purchase shares of EPICENTRX but never received the shares."  *Id*., ¶ 11.

- "These third party putative investors have each alleged that they made significant investments that would support specific drug trials of EPICENTRX in return for promised equity or stock."  *Id*., ¶ 12.

- "The third party putative investors claimed they did not receive the stock, money, or equity promised to them from EPICENTRX despite paying significant amounts of money as a financial investment in EPICENTRX." *Id*., ¶ 13.

- "CARTER believed that this activity was linked to the reports made by the putative investors. Initially, ***the full extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and CARTER believed it needed to be***

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

*investigated*." *Id.*, ¶ 14 (emphasis added).

- "CARTER, upon initially learning of these allegations, directly spoke to ARNOLD ORONSKY, the Chairman of the EPICENTRX board ("A. ORONSKY"), and shared what CARTER had been told." *Id.*, ¶ 15. It is important to note here that Defendant admits in the preceding paragraph that, "the full extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown," and Defendant, "believed it needed to be investigated." Consequently, this vague and unsubstantiated information was all Defendant could have reported to Arnold Oronsky, as Defendant had no further knowledge at that time.

- In his December 20, 2021 Order, Judge Burns made a finding that this allegation (in conjunction with the subsequent PowerPoint he presented to the Board), "make clear that Dr. Carter had no 'actual belief' of wrongdoing. . . . Rather, it appears he was merely relaying yet unsubstantiated allegations of misconduct made to him by third parties. . . . Based on his allegations, the Court finds that Dr. Carter's disclosure to the Board 'was not motivated by his belief that a law had been broken,' . . . and that he was instead merely 'report[ing] information relevant to his employer's interest'" . . . . ECF 157 (Order), 9:12-24.

- "As a result of the claims made by the third party putative investors, in or about April, 2020, CARTER engaged a licensed private investigation firm to further inquire into the facts and validity of these claims." SACC, ¶ 17.

- "As a result of the third party putative investors' communications, as well as the facts established in and conclusively reached by the contracted investigation, CARTER's belief that EPICENTRX employees, agents, and putative agents had engaged in illegal and fraudulent activity was subjectively and objectively reasonable." *Id.*, ¶ 18.

- "In or about September 2019, an independent accounting firm was retained by EPICENTRX to evaluate and audit business and accounting practices at EPICENTRX, in preparation for an anticipated initial public stock offering." *Id.*, ¶ 21.

- "CARTER learned over the next six months, improper and illegal actions by corporate employees and/or consultants and third persons, including but not limited to A. ORONSKY, the EPICENTRX Chairman of the Board, CAROEN, an EPICENTRX employee and member of the EPICENTRX management team, D. DAVIS, a contracted EPICENTRX consultant, and N. ORONSKY who represented himself to be an agent and officer of EPICENTRX, were discovered by the independent accounting firm, EPICENTRX corporate General Counsel, and CARTER. This illicit activity included the creation of previously unknown bank accounts and irregular and adulterated invoices from D. DAVIS, CAROEN and Raj Kumar ("KUMAR")." *Id.*, ¶ 22.

- "The CAP Table that the independent accounting firm was charged by EPICENTRX to audit took over 6 weeks to complete because of the noncooperation of EPICENTRX employees and identified questionable business practices of EPICENTRX and its employees." *Id.*, ¶ 25.

- "The accounting firm that was conducting the evaluation and audit was terminated when irregularities with EPICENTRX business practices were discovered, including unknown and undisclosed bank accounts. CARTER believed that this termination was a result of the accounting firm's discovery of financial irregularities and potentially illegal and fraudulent practices." *Id.*, ¶ 26.

- "Unbeknownst to CARTER, on May 7th and/or 8th, 2020, before the rescheduled Board meeting, some, but not all of the other members of the Board and A. ORONSKY, met to develop a strategy to terminate

CARTER's employment in response to the issues and concerns CARTER had shared." *Id.*, ¶ 31.

- "Prior to and at the full Board meeting, CARTER attempted to present a PowerPoint presentation that outlined his concerns of wrongful conduct by EPICENTRX's employees and agents. The PowerPoint presentation was intended only to be an outline of the putative investor claims and the corresponding wrongdoing of EPICENTRX's employees and agents. CARTER intended to provide further details as to the result of the investigation he had contracted including turning over the reports of the private investigator to the board. CARTER was prevented from providing these further details at the Board meeting. It was reasonable for CARTER not to detail the allegations of misconduct and the evidence of misconduct in a PowerPoint presentation prior to the meeting as the PowerPoint was intended only to be an outline." *Id.*, ¶ 32.

- Notably, in Defendant's First Amended Counterclaim, he characterized the PowerPoint quite differently:  "Prior to and at the full Board meeting, CARTER presented a PowerPoint presentation that ***clearly outlined his concerns for EPICENTRX*** including the various individuals who paid money to invest in EPICENTRX."  ACC, ¶ 29 (emphasis added). Defendant only tried to downplay the PowerPoint after Judge Burns did not find it compelling.

- "CARTER advised the Board that objectivity should be maintained as to any future investigation, so as to not improperly influence the result and conclusions of the independent corporate investigation."  SACC, ¶ 33.

- "Two hours after the conclusion of the May 8, 2020 full Board meeting, CARTER was terminated by EPICENTRX as previously threatened by A. ORONSKY and contrary to other EPICENTRX's executives advising its impropriety." *Id.*, ¶ 35.

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

**J.**     **Reality and the Evidence Clearly Show that Defendant and His Attorney Know the Counterclaims Are Premised on Lies**

Defendant and his counsel are well aware that the primary allegations in the Counterclaim are false, in direct violation of their obligations pursuant to Rule 11.

*First*, Defendant falsely claims that he had a pristine record at EpicentRx, devoid of any criticism.  The truth is, in the Fall of 2019 and early 2020, EpicentRx's senior employees and some Board members began having serious concerns about Defendant's performance and behavior, and they had discussions about terminating Defendant.  The issues with Defendant were contemporaneously documented, including in relation to those 2019 and 2020 discussions.  *See* ECF 271-3 (Caroen MSJ Decl.), ¶¶ 25-30; ECF 271-5 (Reid MSJ Decl.), ¶¶ 21-32, Exs. 1-7.  During this period, Defendant was removed as head of CMC (Chemistry, Manufacturing and Controls) and stripped of his title of Company President; and the Company installed a new protocol, requiring 3 members of management to sign off on all agreements, hiring and monetary payments, rather than just Defendant.  All of the related documents were produced in discovery in this case, so there is no question that Defendant and his attorney were aware of these documents.  On February 1, 2020, Defendant himself wrote a heartfelt apology letter for his behavior to current CEO Tony Reid.  Boock MSJ Decl., ¶ 2 and Ex. 1 (Carter Dep. 203:2-14) and Ex. 31 (Carter Dep., Ex. 24).  This is not the behavior of someone who received no criticism and had a perfect performance record, as Defendant claims in this case.

In the ensuing months, as the result of changes to Company leadership, including the addition of a new Chief Financial Officer and Human Resources contact, employees began disclosing disturbing allegations about Defendant's behavior.  In April 2020, CFO Franck Brinkhaus took over control of EpicentRx's finances from Defendant, due, among other things, to Defendant's irresponsibility in hiring and managing accounting firm Lohman & Dehner, who blew past their budget and informed the Company that they would need double the $500,000 they

had already incurred.  Boock MSJ Decl. ¶11 and Ex. 9 (Lohman Dep. Ex. 6 ) and Ex. 2 (Lohman Dep. 87:19-88:12 [authenticating]).  And Lohman never completed any usable work after all of that cost.  *That* is why they were terminated, not because of any knowledge of Company malfeasance, as Defendant has suggested. Defendant himself complained to management about Lohman's performance, again contrary to his allegations in the Counterclaim.  Boock MSJ Decl., ¶¶12 and Ex. 10; *see also* Declarations of Lohman & Associates, Inc., fka Lohman & Dehner, ¶ 12; Regan Lohman, ¶ 12; Daniel Dehner, ¶ 12; and Shannon Wittman, ¶ 12.

    *Second*, Defendant falsely alleges that accounting firm Lohman & Dehner alerted him to "improper and illegal actions by corporate employees and/or consultants and third persons" and "the creation of previously unknown bank accounts and irregular and adulterated invoices from D. DAVIS, CAROEN and Raj Kumar ("KUMAR")."  SACC, ¶ 22.  The truth is that Lohman found nothing of the kind, as its Person Most Knowledgeable testified at deposition.  Lohman completely contradicted all of Defendant's related allegations and testified under oath that it never reported suspicious activity to Defendant and never found any indicia of fraud.  Boock MSJ Decl., ¶ 3 and Ex. 2 [Lohman Dep. 50:1-17, 51:2-52:3, 56:12-57:8, 57:6-58:17]; *See also* Declarations of Lohman & Associates, Inc., fka Lohman & Dehner, Inc., ¶¶ 6-11; Regan Lohman, ¶¶ 6-11; Daniel Dehner, ¶¶ 6-11; and Shannon Wittman, ¶¶ 6-11; filed concurrently herewith.

    *Third*, Defendant falsely alleges that he learned that agents and employees of EpicentRx were involved in the supposed fraudulent scheme, when Defendant's own documents and deposition testimony make clear that this never happened.  The reality is that, in approximately the summer of 2019, someone named Sandy Singh left Defendant a voicemail message that accused EpicentRx of being "a bunch of crooks."  Defendant did not return her call until nearly a year later, in April 2020. Notes created by Dr. Carter, purporting to document a telephone conversation he had with Sandy Singh on April 17, 2020, state the following, in relevant part:

Sandy stated that Norm Barnes was the front person for a major investment. Investors gave money to Norm Barnes, that Norm Barnes then gave money to Dan Davis and Neil Oronsky for future stock in EpicentRx and for cancer research. Sandy stated that she felt Norm was trying to cover himself and agreed he was making the history complicated. Sandy stated that she was put on investor calls where [sic] initially with Norm Barns and then later with Dan Davis."

The notes created by Defendant included the following questions:

"1) Is EpicentRx involved?

a. Do investors believe they own stock in EpicentRx?

b. Do investors believe they will own stock, if and only if, Dan Davis and Neil Oronsky invest money into EpicentRx?

2) Was EpicentRx represented in any deal and by whom?

3) How was EpicentRx involved?

Did Dan Davis or Neil Oronsky represent themselves as being part of EpicentRx?"

Boock MSJ Decl., ¶¶ 2 and Ex. 1 (Carter Dep. 424:7-426:15) and Ex. 18 (Carter Dep. Ex. 38 at CARTER 0004767-68).

In April 2020, Defendant also hired a private investigator that he paid for with his own money. Prior to the May 8, 2020, Board Meeting, where Defendant was formally terminated at the recommendation of the Company's Human Resources lead, Defendant had no information whatsoever to suggest that EpicentRx, its officers or agents were involved in the purported fraudulent investment scheme. Indeed, as he admitted in his SACC, "the full extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown," and Defendant, "believed it needed to be investigated." ECF 174 (SACC), 4:11-13.

*Fourth*, Defendant falsely alleges that it took a long time to complete the CAP table, "because of the noncooperation of EPICENTRX employees and identified

questionable business practices of EPICENTRX and its employees."  The reality is that Defendant's contemporaneous writings and disclosures tell an entirely different story.  On March 27, 2020, Defendant sent an email to EpicentRx's Security Holders, stating, in relevant part:

> As you may also know, EpicentRx has been working to increase its internal controls. As part of this effort, the company has been working with its accountants and attorneys to audit the Carta cap table to ensure it accurately reflects the capitalization of the company, as approved by its board of directors.
>
> In the course of this effort, we have identified some clean-up items that may impact some of the details of your equity in EpicentRx. Note [sic] of the items we have identified impacts the number of shares you hold. Rather, ***the changes are clerical in nature – confirming board approval dates, vesting schedules and the like – all to match the actual Board approved underlying documents of the company***.

ECF 271-5 (Reid MSJ Decl.), ¶2 9 and Ex. 4 (emphasis added).

If Defendant believed, as he alleges, that EpicentRx and its employees had engaged in questionable business practices that affected the CAP table, he lied to the investors and committed fraud.  The reality is that Defendant never believed that there was anything questionable about the CAP table, but he and his attorney included this false allegation to bolster their case and get past the pleading stage.

*Fifth*, Defendant alleges that he believed that EpicentRx was involved in the fraudulent scheme at the time he made his fictional "disclosure" to the Board and when he was termination.  In addition to the fact that he had no such knowledge, Defendant could not have reasonably believed that EpicentRx had anything to do with this farce.  The only document that Defendant provided to the Board was the purported "Promissory Note" and "Guarantee" attached to his PowerPoint.  Those

documents had been provided to third party Jerald Schutte, who claimed to be a victim of the scam.  However, Mr. Schutte testified that he *never* had any communication with anyone from EpicentRx.  He also testified that he would have known the entire transaction was a scam if he knew that Neil Oronsky was not the Company's CEO (he was not and never was) and that Dan Davis owned no shares in EpicentRx.  In fact, Mr. Schutte stated that he was "stupid" to accept the Personal Guarantee given the different spellings of Mr. Oronsky's name.  Boock MSJ Decl., ¶6 and Ex. 5 [Schutte Dep. 176:13-23, 179:14-180:1, 205:23-206:6].  Defendant *knew all of these facts* – that he, not Neil Oronsky, was the CEO; that Dan Davis owned no shares in EpicentRx; and how Neil Oronsky spelled his name.  Defendant thus knew that the Promissory Note and Guarantee were fraudulent documents on their face, so he would not have believed that EpicentRx had anything to do with the issue.

### K.      Defendant Planned to Harm EpicentRx Before he was Fired

Texts and emails with Defendant produced by Sarah Hibbard (Defendant refused to produce his own text messages) confirmed that Defendant conspired with others to make false accusations and damage EpicentRx well before his termination, and that he knew he was about to be fired.  Examples include without limitation:

- March 11, 2020
  - Hibbard to Carter: ██████████████████
      █ ████████████████
      █ ██████████████████████
      █ ███████████████████████
      █ ████████████████████
      █ ██████████████
- March 23, 2020
  - Carter to Hibbard: ████████████████████████
    ████████████████████

- o Hibbard to Carter: █████████████████████
- • March 24, 2020 (Hibbard to Carter): ████████████████████
  ██████████████████

- • April 1, 2020
  - o Carter to Hibbard: ████████████████████
    ████████████
    ██████████████████████████
    ██████████
    ███████████████████
- • April 11, 2020 (Hibbard to Carter): ██████████████████
  ██████████████████████████
  ████████

- • April 16, 2020
  - o Hibbard to Carter: ████████████████
    ███████████████████████

Boock MSJ Decl., ¶ 5 and Ex. 4 [Hibbard Ex. 5 at 000537, 545-46; 000550; 000557; 573]; Boock Decl., ¶ 9, Exs. F and G.

**L.** **Defendant and His Counsel Deceive EpicentRx and the Court as to the Illegal Surveillance Cameras**

Shortly after EpicentRx fired Defendant for cause, the Company discovered that Defendant had surreptitiously installed three audio-visual recording devices. EpicentRx believed that all three of the devices were made by a company named Canary. Unbeknownst to EpicentRx, one of the devices was from a company named Blink, which Defendant and his counsel first disclosed during Defendant's deposition in April 2022, nearly two years after the case was filed. Boock Decl., ¶ 10, Ex. H (Carter Tr.), 190:4-195:3. Defendant and his attorneys rested on EpicentRx's belief that all three devices were made by Canary, and they never provided any information, documents or recordings related to the Blink device in

discovery or in compliance with this Court's Order granting in part EpicentRx's Motion for Preliminary Injunction.  Boock Decl., ¶¶ 10-27, Exs. H-K.  Neither the Court nor EpicentRx were aware that one of the devices was made by Blink, and Defendant and his attorneys did their best to keep it that way.

Defendant and his attorneys may have thought they were being cute, but they were, in fact, perpetuating another fraud on the Court.  For example, in Judge Burns' April 1, 2021 Order on the Preliminary Injunction [ECF 104], he wrote:

> The Court construes the Motion as including only the specific requests it contains, and not other information included in the later motion (Docket no. 80), or any other information not specifically identified in the Motion. Carter has already turned over some proprietary information, but EpicentRx believes he is still retaining some. The information includes:
>
> - Audio-visual Recordings *from two of three cameras* Carter allegedly used [the third was the Canary camera for which Carter already provided videos];
> - Cloud storage accounts containing the video files;. . . .
>
> Carter purchased *three Canary Home Security Camera System cameras and installed them in EpicentRx's premises*. EpicentRx offers evidence that they were located in Carter's office, in the lobby, and in a main work area, and were able to record a panoramic view of each area. (Docket no. 19 (Carbonel Decl.), ¶¶ 2–5.) The evidence shows that the audio-visual feed was sent to a Cloud storage account controlled by Carter, and which EpicentRx has not been able to examine. (Id., ¶ 5.) Carter turned over the recordings from one camera, the one in his office.

ECF 104 (April 1, 2021 Court Order), 4:12-19, 8:27-9:6.

Defendant's August 3, 2020 Declaration attested to the fact that the "other cameras" were battery operated and had ceased to function.  ECF 23-2 (August 3, 2020 Carter Decl.), ¶ 32.  He attached his correspondence with the Canary company "confirming that the battery-operated cameras ceased operation."  *Id*.  In reference to that correspondence, the Court wrote in its Order:

---

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

> Although Carter says there were battery-operated cameras in addition
> to the plug-in camera, the email he sent to Canary mentions only two,
> and seeks information about the camera aimed at the main entrance.
> The emails make no reference to the camera that was pointed at the
> main work area, which EpicentRx believes could have captured video
> of research. The emails say that the last video captured on that camera
> was in January of 2020. It is not clear whether Carter has already
> turned over that video and any previous videos from the main
> entrance camera.

ECF 104 (April 1, 2021 Court Order), 9:17-24.

The Court was clearly under the impression that all 3 devices were made by Canary and further wrote: "With respect to audio-visual recordings captured by the *three security cameras and uploaded to Canary Cloud Storage*, the Court finds the four-part *Winter* standard is satisfied." *Id.*, 10:6-8 (emphasis added).

The Court Ordered Defendant to provide access to the two cameras for which Defendant had not previously provided recordings. *Id.*, 10:27-11:7. Clearly, here, the Court relied on the conclusion that all three were Canary devices, a notion of which Defendant disingenuously did not disabuse the Court before or after this Order. Moreover, the obvious intent of the Order was for Defendant to turn over all remaining recordings from any device installed on EpicentRx's property, yet Defendant and his counsel purposely did not do so for the Blink device.

Indeed, in Defendant's Answer [ECF 8] and Amended Answer [ECF 39], Defendant admitted, in relevant part, "CARTER admits EPICENTRX was aware his office was broken into and that CARTER had purchased a camera system until the full security system was installed." ECF 8, ¶ 82; ECF 39, ¶ 82. The only "camera system" that EpicentRx referenced in the Complaint was the one made by Canary. ECF 1 (Complaint), ¶¶ 77-86.

On November 16, 2021, EpicentRx served a set of Requests for Production on Defendant. Boock Decl., ¶¶ 15-16. Request No. 296 sought, "ANY and all audio, video and audio-visual recordings taken on EPICENTRX property." Defendant's

response, signed by his attorney, was, "Objection, Defendant has previously produced the requested items multiple times." *Id.*, ¶ 15.  Defendant and his attorney knew that they had not only produced any Blink recordings, they had never even disclose the existence of the Blink device.

Request No. 342 sought, "ANY and all DOCUMENTS and COMMUNICATIONS CONCERNING user activity logs for YOUR Canary Account associated with the three Canary audio-visual recording devices YOU installed at EPICENTRX, including without limitation subscription information, all cameras associated with YOUR account, all videos saved to YOUR account, all videos every bookmarked to YOUR account, all videos deleted from YOUR account, all videos saved to a non-EPICENTRX device, and all user logins to YOUR account." *Id.*, ¶ 16.  Defendant responded, "Defendant currently has no documents responsive to this request in his possession, custody or control." *Id.*. Notably, Defendant did not correct or even mention the reference to the "three Canary audio-visual recording devices," much like he failed to do with the Court.

Defendant and his attorney perpetrated this fraud from the beginning.  In his August 3, 2020 Declaration, Defendant wrote, among other things:

- "EPICENTRX has feigned great umbrage at the installation of a Canary Video System which they knew I installed in 2019."

- "Further, and more importantly, the management of EPICENTRX absolutely knew that I had the Canary System installed."

- "I have now provided EPICENTRX with a copy of all available videos captured by the Canary System. See Carter Declaration, Exhibit 3, Paragraph 6. The videos came from the only plug in camera. The other cameras were battery operated and had ceased to function because of dead batteries some months earlier and, accordingly, no videos were available from those. Exhibit 8 to this declaration is a true and correct copy of documents confirming that the battery-operated cameras ceased operation in January, 2020 and thus, no videos were recorded."  (It is notable that, in reference to the Canary System, Defendant refers to one "plug in camera"

and multiple "other cameras were battery operated," intentionally
misleading EpicentRx to believing that Defendant was referring to the
three Canary devices, since there were only three devices.)

ECF 23-2 (August 3, 2020 Carter Decl.), 11:12-13, 11:23-24, 12:15-22.

In their opposition to Defendant's Motion for Preliminary Injunction,
Defendant's attorney wrote, "CARTER has already voluntarily provided all video
recordings and all EPICENTRX work product, including all work product contained
on his personal computer." ECF 23 (Opposition to PI Motion), 4:13-15. Again,
Defendant and his counsel have never provided *any* information or recordings from
the Blink device. Their purposeful obfuscation of the Blink device, even in the face
of a Court Order, is wholly improper and worthy of Rule 11 sanctions by itself.

## M. Defendant and His Attorneys Refuse to Return Company Property

To date, Defendant has not returned all of the Company property and
proprietary materials in his possession. EpicentRx discovered the following from
forensic examinations of the equipment Defendant returned: (i) Two days after his
termination and the day before Defendant's attorney sent a letter to EpicentRx,
threatening a wrongful termination lawsuit and making a preservation demand,
Defendant watched a video entitled, "How To Permanently Delete Previously
Deleted Files On A Mac." Defendant then ran the program described in the video;
(ii) Defendant had a Time Machine backup drive connected to his other Company-
owned MacBook Pro, which had not been previously disclosed, nor has any data
been produced; (iii) Despite now claiming that he never possessed an iPhone 7 Plus,
personal photographs – including those of his fiancée – were found on the MacBook
he did return, with more than 80 taken by an iPhone 7 Plus. Defendant previously
maintained that he did have the iPhone 7 Plus at one time, but he traded it in for a
computer; (iv) Defendant submitted a Declaration stating he had turned over all
proprietary information to EpicentRx. ECF No. 21 (Erik Laykin Declaration in
Support of TRO), ¶ 5(a)-(e). However, he subsequently attached EpicentRx

confidential and proprietary materials as exhibits to his briefing in opposition to the

Preliminary Injunction and he produced other materials in discovery in August.

None of these had been turned over to EpicentRx.  ECF No. 27 (EpicentRx Motion

to Seal), 2:15-3:5; Boock Decl., ¶ 27.  It is clear that Defendant maintains a trove of

EpicentRx materials that he has not turned over.

**N.    Defendant And His Attorneys Engage In Egregious Litigation Conduct To Deflect From Their Violations of Rule 11**

Due to the lack of any salient facts or relevant law to buttress their case,

Defendant and his counsel have been taking increasingly desperate measures to

harass EpicentRx and deflect attention from their clear violations of Rule 11.

Salient examples include, but are most definitely not limited to the following:

- During the deposition of Gail Carter on July 28, 2022, in response to
  EpicentRx's counsel granting defense counsel's request for a standing
  objection to a line of questioning, and then politely explaining why the
  issues were relevant, Defendant's counsel stated on the record, ████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████ "
  Boock Decl., ¶ 28, Ex. L (Transcript of Deposition of Gail Carter ("Gail
  Carter Tr."), 75:1-4.  Not only is this wildly untrue, it is in violation of
  Southern District Local Rule 2.1(a)(1) and (3).  Although EpicentRx's
  attorney raised the impropriety of this conduct multiple times, Defendant's
  counsel did not retract the statement or take any action to ameliorate this
  improper conduct.

- During the deposition of Meaghan Stirn, on December 13, 2021,
  Defendant's counsel asked Ms. Stirn about the "sexual harassment
  complaints against Scott Caroen," which was not only a completely
  fictional statement that was designed to embarrass Mr. Caroen, who was
  sitting in the room, but was inflammatory and irrelevant to the case.

Boock Decl., ¶ 29, Ex. M (Transcript of Deposition of Scott Caroen ("Caroen Tr."), 161:22-23.  Defendant and his attorney know that there were no sexual harassment complaints against Mr. Caroen, so Defendant's counsel's question was clearly for an improper purpose.  In addition, it was Dr. Carter, not Mr. Caroen, who was terminated for cause, in part due to his mistreatment and denigration of subordinates, particularly women. Mr. Caroen remains gainfully employed at EpicentRx, as Senior Director of Operations and Corporate Development.

- During Ms. Stirn's deposition, Defendant's counsel asked Ms. Stirn if she, "sent Neil Oronsky a present of the novel '50 Shades of Grey' wrapped in your lace underwear along with some sex toys."  Boock Decl., ¶ 30, Ex. M (Transcript of Deposition of Meaghan Stirn ("Stirn Tr."), 13:6-9.  As Defendant and his counsel well know, the premise of this question was entirely false and wholly irrelevant, and asking it was wildly inappropriate.

- On two separate occasions, EpicentRx's counsel has caught Defendant coaching witnesses, without any admonition from his attorney.  The first was at the deposition of Maggie Neptune on December 16, 2021, when Defendant emphatically gave Ms. Neptune the "thumbs up" hand gesture while she was testifying.  When EpicentRx's attorney asked Defendant to cease this improper conduct, Defendant's counsel yelled at EpicentRx's attorney, demanding that he never address Defendant again.  But he did not admonish his client for the coaching that occurred in the first place. Boock Decl., ¶ 31, Ex. N (Transcript of Deposition of Maggie Neptune ("Neptune Tr."), 74:16-75:4.  The second occurred during the deposition of Christian Carter, on July 27, 2022, when Defendant was nodding or shaking his head in response to questions, in full view of the witness, his son.  Boock Decl., ¶ 32, Ex. O (Transcript of Deposition of Christian Carter), 31:3-15.  He turned his video off when EpicentRx's counsel raised

the issue and asked Defendant's counsel to ask him to stop, but this should never have occurred in the first place. *Id.*

- Defendant's counsel has also attempted to elicit testimony that he knows to be false. For example, during the deposition of Gail Carter, on July 28, 2022, Defendant's counsel asked, ███████████████████████ ████████████████████████████████ ████████████████████████████████ ████████ Boock Decl., ¶ 33, Ex. P (Transcript of Deposition of Gail Carter), 158:24-159:2. This was an astonishing question, considering that Defendant himself produced documents reflecting ████████████████ ████████████████████████████████ ████████████████████████████████ Boock Decl., ¶ 7, Ex. D. Encouraging a third party witness to make untruthful statements is completely improper.

## III.  ARGUMENT

### A.  Rule 11 Calls for Terminating and/or Monetary Sanctions

Pursuant to Federal Rules of Civil Procedure, Rule 11(b), by "signing, filing, submitting, or later advocating" a pleading, an attorney or party "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the pleading, among other things:

- "is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation";
- "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law";

- "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"; and

- "the denials of factual contentions are warranted on the evidence or, if

1
2
specifically so identified, are reasonably based on belief or a lack of information."

3   Rule 11 sanctions are appropriate when a pleading contains both meritorious
4   and meritless claims. *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d
5   497, 504-05 (2nd Cir. 1989).  The Rule "is designed to deter attorneys and
6   unrepresented parties from violating their certification that any pleading, motion or
7   other paper presented to the court is supported by an objectively reasonable legal
8   and factual basis; no showing of bad faith or subjective intent is required."
9   *Truesdell v. S. Cal. Permanente Med. Grp.*, 209 F.R.D. 169, 173–74
10  (C.D.Cal.2002).

11   If "the court determines that Rule 11(b) has been violated, the court may
12  impose an appropriate sanction on any attorney, law firm, or party that violated the
13  rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).  Sanctions may
14  include attorneys' fees to the prevailing party. Id., 11(c)(2) and (4).  Sanctions may
15  also include terminating sanctions. *Gionis v. California Bureau for Private*
16  *Postsecondary Educ.*, 2014 WL 466276 (E.D. Cal. 2014) (issuing terminating
17  sanctions under Rule 11 for filing a frivolous complaint).  The goal of the sanctions
18  is effective deterrence of the conduct at issue by the sanctioned party and others
19  similarly situated.  *Id*.; Rule 11(c)(4).

20   The Court may impose Rule 11 sanctions against a represented party.
21  *Business Guides, Inc. v Chromatic Communications Enterprises, Inc.*, 498 U.S. 533,
22  543-44 (1991); *Grynberg v. Ivanhoe Energy, Inc.*, 663 F.Supp.2d 1022, 1025 (D.
23  CO 2009); Rutter Group, Federal Civil Procedure Before Trial, 17:564 (2016).
24  Sanctions are especially appropriate against Defendant and his attorney here, as
25  Defendant was the only person to sign his declaration in opposition to EpicentRx's
26  Application for a Temporary Restraining Order; and Defendant's counsel signed all
27  of the pleadings in this case.

28

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

1  **B.     Defendant and His Counsel Premise Their Entire Case on**
2  **Allegations That They Know to be False And Were Disingenuous**
3  **About the Surveillance System.**

4  Defendant and his counsel's entire case, including his Second Amended
5  Complaint, relies on three primary assertions: (1) that the fraudulent note was a
6  "Personal Guarantee signed by Neil Oronsky who misrepresented that he was the
7  Company's CEO"; (2) that Defendant "had a subjectively and objectively
8  reasonable belief that agents of EpicentRx and/or third parties associated with
9  EpicentRx were violating state and federal laws"; and (3) that he disclosed to
10 EpicentRx that it was involved in the supposed fraudulent scheme or some other
11 violation of state or federal law.  Defendant and his counsel know that none of these
12 assertions are true.

13     Here, the "Promissory Note" and "Personal Guarantee" was fraudulent on its
14 face.  Defendant's admission that Neil Oronsky's name was misspelled on the
15 document, along with the other glaring errors and financial absurdities and the
16 inconsistency with the purported investment scheme, clearly show that he and his
17 attorney were well aware that the fraudulent document could not support his claims.
18 Nonetheless, for more than two years undeterred, he has tried to mislead this Court –
19 much like he tried to do to the Board – and suggest that Neil Oronsky (who he
20 admits "had no office, executive position or authority with EPICENTRX") signed a
21 "corporate debt instrument," and that this somehow provided evidence and an
22 objectively and subjectively reasonable belief that EpicentRx was involved in
23 wrongdoing.  This is hogwash, plain and simple, and Defendant and his attorney
24 know it.

25     Defendant's false allegations and arguments that he had a, "subjectively and
26 objectively reasonable belief that agents of EpicentRx and/or third parties associated
27 with EpicentRx were violating state and federal laws and [that he] reported those
28 violations to EpicentRx's management," is belied by facts of which Defendant and

his attorney are well aware.  Defendant has admitted multiple times that, "The extent of participation in the misconduct by officers, employees and/or agents of EPICENTRX was unknown to CARTER and needed to be investigated," which is the exact opposite of the false assertions he now makes to keep his case afloat.

Finally, Defendant's admission that he "presented a PowerPoint presentation that clearly outlined his concerns for EPICENTRX including the various individuals who paid money to invest in EPICENTRX," yet he did not disclose *anything* about EpicentRx being involved, should have been enough for Defendant's counsel to dismiss the Counterclaim.  This is especially true after Judge Burns wrote in his scathing Order, "Where, as here, the allegations directly contradict the presentation attached as an exhibit to the ACC, the Court can't accept those allegations as true." Rather than accept the fact that even Defendant's fairy tale would not state a cause of action against EpicentRx and dismiss the Counterclaim, Defendant and his counsel instead opted for more creating writing.  In the sequel to their work of fiction, Defendant and his counsel suddenly claimed that Defendant did not "detail the allegations of misconduct and the evidence of misconduct" in his presentation to the Board, because they were prevented from doing so.  At no point prior to the Court's Order granting the Motion to Dismiss did Defendant <u>ever</u> make such a claim.  It was only after the Court made clear that it was not buying Defendant's story that Defendant and his counsel decided to augment it with new tales.

Defendant and his counsel's certification under Rule 11 does not pass muster. Defendant and his attorneys have clearly maintained their case against EpicentRx "for an improper purpose," "to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Defendant and his attorneys know that their, "claims, defenses, and other legal contentions," are <u>not</u> "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Defendant and his attorneys are also aware that their factual contentions have zero "evidentiary support," nor with they ever "likely have

1  evidentiary support after a reasonable opportunity for further investigation or

2  discovery."  And after more than two years of litigation, it is crystal clear to

3  Defendant and his counsel that their "denials of factual contentions," are <u>not</u>

4  "warranted on the evidence or, if specifically so identified, are reasonably based on

5  belief or a lack of information."

6        In addition, as described above, in their pleadings and in response to this

7  Court's April 1, 2021 Order, Defendant and his attorneys were disingenuous

8  regarding the identity of the audio-visual recording device and were not

9  straightforward with the Court.

10        Defendant and his attorneys have violated every prong of Rule 11(b), and

11  they should be sanctioned.  EpicentRx contends that this egregious conduct warrants

12  terminating sanctions, ending this fraud on the Court once and for all.  If, however,

13  the Court is not inclined to terminate the case, EpicentRx believes that significant

14  monetary sanctions are appropriate.

15  **IV.   <u>CONCLUSION</u>**

16        For the foregoing reasons, EpicentRx respectfully requests that the Court

17  grant its Motion for Sanctions.

18

19  Dated:  February 27, 2023              Respectfully submitted,

20

21                                        <u>/s/ Todd A. Boock</u>
                                          Todd A. Boock (SBN 181933)
22                                         *todd@bnsklaw.com*
                                          **BROWN, NERI, SMITH & KHAN LLP**
23                                        11601 Wilshire Boulevard, Suite 2080
                                          Los Angeles, California 90025
24

25

26

27

28

EPICENTRX MEMO. OF PS & AS IN SUPP. OF RULE 11 MOTION

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that I electronically filed the foregoing with the Clerk of the

3 Court for the United States District Court for the Southern District of California by

4 using the CM/ECF system on February 28, 2023. I further certify that all

5 participants in the case are registered CM/ECF users and that service will be

6 accomplished by the CM/ECF system.

7      I certify under penalty of perjury that the foregoing is true and correct.

8 Executed on February 28, 2023.

9

10                              /s/ Todd A. Boock

11                              Todd A. Boock

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28